UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────

No. 09 Civ. 6916 (RJS)
───────────────

FISCHER & MANDELL LLP,

Plaintiff,

VERSUS

CITIBANK, N.A.,

Defendant.
───────────────

MEMORANDUM AND ORDER
May 27, 2010
───────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff Fischer & Mandell LLP brings this action against Defendant Citibank, N.A. for breach of contract and negligence under New York state law.[1]  Before the Court is Defendant's motion for summary judgment on all of Plaintiff's claims.  For the following reasons, Defendant's motion is granted.

I. BACKGROUND

In January 2009, Plaintiff fell victim to a third party's fraudulent check-cashing scheme and lost over $200,000.  (Fischer Decl. ¶¶ 3-9.)  This action represents Plaintiff's second attempt to shift the losses it incurred as a result of the scheme onto Defendant, its bank.

───────────────
[1] Effective January 1, 2010, Plaintiff changed its name to the Barry Fischer Law Firm LLC.  (Doc. No. 20.)

### A. Facts[2]

#### 1. The Wire Transfers

During the events giving rise to this action, Plaintiff maintained at least two accounts with Defendant: (1) an Interest on Lawyer's Account (the "IOLA") (Def.'s 56.1 ¶ 1) and (2) an Insured Money Market Account (the "Money Market Account") (Fischer Decl. ¶ 9) at Citibank. On January 15, 2009, Plaintiff deposited what appeared to be an official check (the "check"), dated January 12, 2009, for $225,351 into the IOLA. (Def.'s 56.1 ¶ 13.) The check was payable to the order of Plaintiff and was purportedly drawn on the account of Crown Royal Venture, Inc., at Wachovia Bank, N.A. (*Id.*) On January 15, Defendant's Check Processing Unit sent the check to the Federal Reserve Bank for collection from Wachovia. (*Id.* ¶ 14.)

On January 19, 2009, which was a bank holiday, Plaintiff accessed the IOLA, using CitiBusiness Online,[3] for the purpose of ascertaining whether the funds represented by the check were available for withdrawal. (Fischer Decl. ¶ 6.) Plaintiff saw that "all of the money represented by the $225,351 check was available" in the IOLA (*id.*), so it used the online system to schedule a wire transfer of $182,780 from the IOLA to an account in the name of Efficiency Investment at the Hana Bank in Seoul, Korea (the "first transfer") (Def.'s 56.1 ¶ 15). On January 20, 2009, the next banking day, Defendant executed the requested wire transfer and charged Plaintiff a transfer fee. (*Id.*)

On the following day, Plaintiff accessed the IOLA online and saw that the "available" account balance was $61,232. (Fischer Decl. ¶ 8.) That same day, Plaintiff requested, through the online system, a second wire transfer of $27,895 from the IOLA to an account in the name of Kin Ming Lo at TD Canada Trust Bank in Toronto, Canada. (Def.'s 56.1 ¶ 16.) Because Defendant did not have a direct relationship with TD Canada, however, it sent a payment order to Bank of America, N.A. ("BANA"), which was identified as the intermediary bank on the online wire transfer request. (*Id.*) Defendant maintains that it completed the second transfer that day by sending a payment order to BANA over the SWIFT network.[4] (*Id.*) Plaintiff argues that Defendant may not have completed the wire transfer until January 22, which was when the $27,895 debit appeared on Plaintiff's IOLA summary. (Fischer Decl. ¶ 22.)

On January 21, the Federal Reserve Bank returned the check to Defendant as dishonored and unpaid because it was counterfeit. (Def.'s 56.1 ¶ 18; Fischer Decl. ¶ 9.) Defendant then debited the IOLA in the Check's amount, plus a $10 returned check fee, and an overdraft resulted. (Def.'s 56.1 ¶ 19.) On the same day, Defendant mailed copies of the returned check to Plaintiff, and a representative of Defendant called Plaintiff to notify it that the check was returned as unpaid. (*Id.* ¶¶ 19-20.) At 3:30 p.m. on January 21, Plaintiff asked Defendant's employee named Norma to cancel and recall the wire transfers, and she

---

[2] Because Defendant moves for summary judgment, the facts discussed, except as otherwise noted, are either undisputed or presented in the light most favorable to Plaintiff.

[3] "CitiBusiness Online" is "a banking and information service that permits CitiBusiness clients to access a number of banking services through the use of personal computers." (Haslam Decl., Ex. D at 1.)

[4] The "Society for Worldwide Interbank Financial Telecommunication, or SWIFT, provides a network to allow financial institutions to transfer financial transactions through a 'financial message'." (Haslam Decl. ¶ 18 n.1.)

responded that she would try to do so. (*Id.* ¶¶ 15-16.) Defendant, however, did not seek to cancel and recall the wire transfers until the next morning at 6:11 a.m. and 6:14 a.m. (*Id.* at ¶ 19.)

On January 27, 2009, BANA responded that the beneficiary had already withdrawn the funds, so it could not cancel and recall the $27,895 wire transfer. (Def.'s 56.1 ¶ 22.) Similarly, on or about January 28, 2009, Hana Bank advised Defendant that it had credited the $182,769.86 to the ultimate beneficiary's account on January 21, 2009 and that the beneficiary withdrew all of the credited funds on that day. (*Id.* ¶ 23.) Because Plaintiff's IOLA was now overdrawn, on January 28, 2009, Defendant exercised its "right of set-off" and offset the amount of the overdraft in the IOLA by deducting the overdraft amount from the Plaintiff's Money Market Account. (*Id.* ¶ 24.)

2. The Account Agreements

Plaintiff and Defendant agree that Plaintiff's IOLA and Money Market accounts were governed by the CitiBusiness Client Manual[5] and any other account agreements. (Def.'s 56.1 ¶ 2.) The account agreements most relevant to this action are the CitiBusiness Client Manual, the Citibank Marketplace Addendum, and the CitiBusiness User Agreement. (Def.'s 56.1 ¶¶ 3, 6, 9.)

The Client Manual provides that Defendant will deduct the amount of a returned check from the account holder's balance (Haslam Decl., Ex. B at 25), and the "right of set-off" provision specifically allows Defendant to deduct that money from "any account held by the business to pay any overdraft or debt that the business owes [to Citibank]" (*id.* at 5). The Client Manual also provides that a customer may attempt to cancel a wire transfer only if Defendant receives the customer's cancellation before it transfers the funds. (*Id.* at 26.) If the funds have already been transferred, then, "[i]n general," the account holder can cancel the transfer only if "the beneficiary bank consents to such a request." (*Id.*)

The Marketplace Addendum clarifies that a deposited check does not clear "until the bank on which the check is drawn either honors or returns it to Citibank unpaid" and that a deposited check "may be returned unpaid after [Citibank has] made the funds available to [the account holder]." (Haslam Decl., Ex. C at 15.) The Addendum also provides that holders can "get information about [their] available account balances any time" from Defendant's ATMs, phone banking service, or online banking service. (*Id.*) As discussed below, Plaintiff and Defendant disagree about what "available account balances" mean.

The User Agreement provides that the customer agrees to "give instructions through CitiBusiness Online to make transfers or payments (including wire or cable transfers) from an account only when a sufficient balance is, or will be, available in that account at the time of withdrawal." (Haslam Decl., Ex. D, at 1.) The User Agreement also contains a similar provision binding Defendant not to "act on" a customer's online transfer requests if "sufficient funds are not available." (*Id.* at 2.)

---

[5] The parties have attached different versions of the CitiBusiness Client Manual to their papers. Plaintiff's version is effective January 15, 2009, while Defendant's version is effective April 27, 2007. The differences between the versions, however, are irrelevant to the Court's decision.

### B. Procedural History

On February 2, 2009, Plaintiff filed a complaint against Defendant in a prior case based upon the same set of facts as this case. *Fischer & Mandell LLP v. Citibank, N.A.*, No. 09 Civ. 1160 (RJS). Without conducting any discovery, the parties filed cross-motions for summary judgment on May 15, 2009. The Court granted Defendant's motion in regard to the federal claims brought pursuant to the Electronic Fund Transfer Act and the Expedited Funds Availability Act. *See Fischer & Mandel, LLP v. Citibank, N.A.*, No. 09 Civ. 1160 (RJS), 2009 WL 1767621 (S.D.N.Y. June 22, 2009). The Court declined to exercise supplemental jurisdiction over Plaintiff's state law claims. *Id.*

On July 14, 2009, Plaintiff commenced an action in New York State Supreme Court on the state law claims. After being served with copies of the summons and complaint on August 5, 2009, Defendant immediately removed the action, pursuant to 28 U.S.C. § 1441(a).[6] Defendant filed this motion for summary judgment on October 30, 2009, and the motion was fully submitted on December 10, 2009.

### II. STANDARD OF REVIEW

A court may grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson*, 477 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation omitted) (alteration in original).

### III. DISCUSSION

Plaintiff alleges both breach of contract and negligence. For the following reasons, the Court grants Defendant's motion for summary judgment on both causes of action.

#### A. Breach of Contract

Plaintiff asserts two bases for its breach of contract claim. First, Plaintiff alleges that Defendant breached the contract by erroneously describing the money in its IOLA as being "available." Second, Plaintiff alleges that Defendant breached the

---

[6] Defendant is a national banking association organized under the laws of the United States with a main office, as described in its articles of association, located in Nevada. Accordingly, Defendant is a citizen of Nevada for diversity purposes. *See Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). Plaintiff is a limited liability partnership with its principal place of business in New York. Thus, because of the parties' diverse citizenship, as well as the amount in controversy being over $75,000, the Court has jurisdiction over this case pursuant 28 U.S.C. § 1332.

contract by executing wire transfers against insufficient funds.

### 1. U.C.C. Preemption

As an initial matter, Defendant argues that New York's Uniform Commercial Code ("U.C.C.") preempts Plaintiff's common law breach of contract claims. The Court disagrees. Article 4 of the U.C.C. governs bank deposits and collections, N.Y. U.C.C. § 4-101, and Article 4-A governs "funds transfers," *id.* § 4-A-102.[7] Both articles, however, recognize the parties' right to define this action's disputed contractual terms by agreement.

With respect to Article 4, all of that article's provisions "may be varied by agreement," except for terms regarding the parties' lack of good faith or failure to exercise ordinary care. *Id*. § 4-103(a). Neither of those exceptions applies to this action.

As for Article 4-A, only some of that article's provisions may be varied by agreement. In *Grain Traders, Inc. v. Citibank, N.A.*, the Second Circuit interpreted Article 4-A "to preclude common law claims when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A." 160 F.3d 97, 103 (2d Cir. 1998); *accord Centre-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*, 913 F. Supp. 202, 206 (S.D.N.Y. 1996) ("[R]esorting to principles of law or equity outside of Article 4-A is acceptable, so long as it does not create rights, duties and liabilities inconsistent with those stated in [Article 4-A].") (internal quotation marks and citation omitted); *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403, 414 (S.D.N.Y. 1995) (denying motion to dismiss common law claims because the claims did "not conflict with any of Article 4-A's provisions"). Article 4-A specifically allows Defendant, which was the receiving bank, to vary its duties to Plaintiff, which was the sender of the wire transfers, by agreement. *See* N.Y. U.C.C. § 4-A-212 ("A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts . . . and the bank owes no duty to any party to the funds transfer except as provided in this Article *or by express agreement*." (emphasis added).)

Thus, without deciding whether Article 4 or Article 4-A applies to Plaintiff's common law breach of contract claims, the Court finds that the U.C.C. does not preempt those claims.

### 2. Legal Standard

There are four elements to a breach of contract claim under New York state law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). In determining a party's obligations under a

---

[7] Article 4-A defines "funds transfers" to mean "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." N.Y. U.C.C. § 4-A-104(1). The wire transfers at the center of this case are payment orders because the U.C.C. defines "payment order" to mean "an instruction of a sender to a receiving bank . . . to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" if three conditions are met. *Id.* § 4-A-103(1)(a). All three conditions are met in this case. Plaintiff, furthermore, was the sender of the payment order. *See id.* § 4-A-103(1)(e) ("Sender means the person giving the instruction to the receiving bank.") (internal quotation marks omitted). Defendant was the receiving bank. *Id.* § 4-A-103(1)(d) ("Receiving bank means the bank to which the sender's instruction is addressed.") (internal quotation marks omitted).

contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Associates, Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (citation omitted). "Ambiguity in a contract is the inadequacy of the wording to classify or characterize something that has potential significance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004). "Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language." *Alexander & Alexander*, 136 F.3d at 86.

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)). However, "[w]here the resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148-49 (2d Cir. 1993) (citations omitted).

3. Analysis

The parties do not dispute that a valid contract existed between them and that Plaintiff adequately performed on the contract. The parties disagree as to whether Defendant breached the contract and whether damages ensued from such a breach. Because Defendant is moving for summary judgment, the Court must interpret the contract and then determine whether, under that interpretation, there are any disputed issues of material fact as to Defendant's performance. The Court, therefore, will consider each of the contested contractual terms individually.

a. "Available Funds"

Plaintiff argues that Defendant breached its contract when it advised Plaintiff that the funds in its IOLA were "available." The parties agree that Defendant's online banking site displayed the IOLA as having $244,032 in "available" funds before Plaintiff made the first transfer and $61,232 in "available" funds before Plaintiff made the second transfer. The parties disagree, however, about what "available" means.[8] Plaintiff argues that available account balances "disclose the amount that is available for withdrawal as of right and thus collected funds." (Pl.'s 56.1 ¶ 8.) Defendant maintains that available account balances "disclose the amount that is available for withdrawal from the account" but not "specific deposits for which there has [sic] been final settlement by the payor

---

[8] Neither Article 4 nor Article 4-A explicitly defines "available funds." The Court agrees with Defendant that "available for withdrawal as of right," as defined by § 4-213(4), is not synonymous with "available" as used in the parties' agreements.

bank."[9]  (Def.'s 56.1 ¶ 8.)  In other words, Defendant claims that available funds "cannot be construed to consist solely of collected funds." (*Id.*)

A review of the account agreements reveals that Defendant's argument is correct. The Citibank Marketplace Addendum clearly advises customers to "note that a check [they] deposit may be returned unpaid after [Citibank has] made the funds available to you.  If this happens, the amount of the returned check will be deducted from your account balance." (Haslam Decl., Ex. C at 15.)  This explanation is found under a section, entitled "When Does a Check Clear?", which relays the general standard for check clearance.  (*Id.*)

Confronted with this clear language, Plaintiff asks the Court to focus on an exception to Defendant's standard funds-availability policy.  That exception, which is listed under a section entitled "Exceptions to Citibank's Standard Funds Availability Policy," states that Defendant "may require that any check you present for deposit be sent out for collection.  That is, your funds will be available after we have received payment from the bank on which the check is drawn." (Haslam Decl., Ex. B, at 12.)  Plaintiff argues that this explanation indicates that available funds *must* be collected funds or, alternatively, that the meaning of "available" is ambiguous and thus Plaintiff's claim should survive summary judgment.

The Court disagrees.  The Marketplace Addendum's section explaining check clearance in general explicitly states that funds marked as available are provisional until all deposited checks clear.  The exception on which Plaintiff relies does not place the meaning of "available funds" in doubt.  The exception merely reserves Defendant's right to stray from its usual procedure of making a check's funds available before collecting those funds.[10]

b. Sufficient Funds

Plaintiff next argues that Defendant breached the contract when it executed the wire transfers against insufficient funds. In essence, Plaintiff asks the Court to determine that "sufficient funds" are synonymous with Plaintiff's definition of "available funds" — meaning collected funds.[11]

---

[9] Article 4 defines "settle" to mean "to pay in cash, by clearing-house settlement, in a charge or credit or by remittance, or otherwise as agreed.  A settlement may be either provisional or final." N.Y. U.C.C. § 4-104(1)(l).  Section 4-213 describes various scenarios in which a settlement becomes final.  In this case, there was never a final settlement on the funds represented by the check because, as the check was returned as dishonored and unpaid, Defendant never received the funds from Wachovia.  Defendant made only a provisional settlement of the funds represented by the check.  At issue in the breach of contract claim, therefore, is Defendant's obligations in connection with a provisional settlement.

[10] Plaintiff not only misinterprets but also misquotes another provision in the Client Manual under a section entitled "Overdraft Protection."  Plaintiff writes, "[t]he Client Manual makes it explicit that 'available funds' are 'collected funds.'  The manual refers to the use of a CitiBusiness Safety Check as a means to cover the customer's use of 'deposited funds in your checking account that are not yet available (uncollected).'" (Pl.'s Opp. at 8-9.)  That provision actually reads: "The linked contributing account also covers the use of deposited funds that are not yet available in the checking account." (Haslam Decl., Ex. B, at 36.)  The word "uncollected" does not appear anywhere in the text, suggesting either a willful misinterpretation of the text designed to mislead the Court or, at best, a careless reading by Plaintiff.  Neither alternative is acceptable.

[11] Plaintiff's argument as to the meaning of "available" and "sufficient" is not even internally logical.  If "available" and "sufficient" share the same meaning, then statements such as "Citibank will not act on [a customer's] CitiBusiness Online

In making this claim, Plaintiff relies on language in the User Agreement and Client Manual. The User Agreement provides that the customer agrees to "give instructions through CitiBusiness Online to make transfers or payments (including wire or cable transfers) from an account only when a sufficient balance is, or will be, available in that account at the time of withdrawal." (Haslam Decl., Ex. D, at 1.) The User Agreement further provides that "Citibank will not act on [a customer's] CitiBusiness Online withdrawal instructions if sufficient funds are not available." (*Id.* at 2.) The Client Manual provides that Defendant may reject a customer's transfer request because there are "insufficient funds" or funds that "are not yet available" in the customer's account. (Haslam Decl., Ex. B, at 27.)

Plaintiff argues that, because Defendant had not yet received a final settlement on the deposited check, there were insufficient funds in the IOLA when Defendant made the requested wire transfers. The Court agrees with Defendant that "the Agreements do not state that sufficient funds mean 'collected' funds. Thus, the term 'sufficient,' as that that term is used in the Agreements, must be interpreted in accordance with its standard dictionary definition which is 'enough to meet the needs of a situation or proposed end.'" (Def.'s Reply at 6 (citation omitted).) Accordingly, the limitation to make a transfer only if sufficient funds exist in the Plaintiff's account means that Defendant will only transfer funds if there are *enough available* funds in the account to cover the amount of the requested transfer.

Employing its own definition of "sufficient," Plaintiff argues that a customer accessing her account online cannot know if sufficient funds exist in her account because Defendant's online system does not distinguish between provisional funds and funds on which there has been final settlement. Plaintiff fails to see that the customer's obligation is in fact perfectly consistent with the actual definition of sufficient, available funds. A customer's online account statement always allows her to determine whether sufficient, available funds exist in her account because it always allows her to identify whether *enough* available funds exist. The fact that the online account statement does not allow a customer to determine whether a final settlement has occurred is irrelevant to the legal question presented, as the account agreements do not require the customer to make only transfers of funds on which a final settlement has occurred.

Given the unambiguous meanings of "available" and "sufficient" in the account agreements, it is clear that Defendant did not breach its contract with Plaintiff. On January 20, Defendant executed a transfer of $182,780 when $244,032 of sufficient and available funds existed in the account. On January 21, Defendant executed a transfer of $27,895 when $61,232 of sufficient and available funds existed in the account. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's breach of contract claim.

### B. Negligence

Plaintiff's negligence claim is rooted in the 15-hour delay between the time when its representative spoke with "Norma," Defendant's employee "who identified herself as a customer service specialist in the cancellation and recall of wire transfers," and the time Defendant requested that the

---

withdrawal instructions if sufficient funds are not available" would have no meaning whatsoever. (Haslam Decl. Ex. D, at 2.)

wire transfers be cancelled or recalled. (Fischer Decl. ¶ 15.) On January 21 at 3:30 p.m., Norma indicated that Defendant would attempt to cancel and recall the wire transfers, and she assigned Plaintiff a cancellation and recall identification number for each of the wire transfers. (*Id.* ¶ 16.) Defendant, however, did not attempt to cancel and recall the first wire transfer until 6:14 a.m. on January 22, 2009. (Haslam Decl., Ex. M.) It did not attempt to cancel and recall the second wire transfer until 6:11 a.m. on January 22, 2009. (*Id.*) Plaintiff argues that this delay was a breach of the duty of care Defendant owed Plaintiff.

### 1. Legal Standard

Because Plaintiff's negligence claim concerns the cancellation of wire transfers, it is covered by Article 4-A, which governs fund transfers.[12] *See* N.Y. U.C.C. § 4-A-211. As discussed above, Article 4-A preempts any common law claims inconsistent with its provisions. In *Grain Traders*, the Second Circuit specifically cited to *Aleo Int'l, Ltd. v. Citibank, N.A.*, 612 N.Y.S.2d 540, 541 (Sup. Ct. 1994), for the proposition that there may be "no claim for negligence unless [the] conduct complained of was not in conformity with Article 4-A." *Grain Traders*, 160 F.3d at 103. The *Aleo* Court explained its inquiry as follows: "unless Citibank's failure to cancel [Plaintiff's] transfer order was not in conformity with Article 4-A, plaintiff Aleo has failed to state a cause of action, and this action must be dismissed." 612 N.Y.S.2d at 541. Here, the Court's inquiry is very similar: unless Defendant's 15-hour delay in attempting to cancel Plaintiff's transfer orders was not in conformity with Article 4-A, Plaintiff has failed to state a cause of action, and this action must be dismissed.

---

[12] Surprisingly, Plaintiff's opposition brief does not discuss or even mention Article 4-A.

### 2. Analysis

Article 4-A provides that "a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order." N.Y. U.C.C. § 4-A-211(2). The Article further provides that Defendant, as the receiving bank, accepted the wire transfers when it executed the orders. *Id.* § 4-A-209(1). "A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank." *Id.* § 4-A-301(1).

#### a. The First Wire Transfer

Defendant executed the first wire transfer at 7:51 a.m. on January 20, 2009. (Haslam Decl., Ex. I.) Therefore, when Norma undertook to cancel and recall the wire transfers, Defendant had already accepted the wire transfer by transferring the funds to Hana Bank.

"After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank." *Id.* § 4-A-211(3). Plaintiff does not claim that Norma agreed to cancel the wire transfers but just that she agreed to "undertake to do so" while indicating that "there was a good chance that the cancel and recall could be accomplished." (Fischer Decl. ¶ 15.) The Client Manual, furthermore, provides that a customer may cancel a wire transfer "only if" Defendant receives the customer's instructions "before [it sends] the funds transfer and provided [it has] a reasonable

time to act" on the customer's instructions. (Haslam Decl., Ex. B, at 26.) No party describes, nor is the Court aware of, any funds-transfer system rule that allowed cancellations after acceptance. Thus, Defendant acted in conformity with Article 4-A. Plaintiff, therefore, has no cause of action with respect to the cancellation of the first wire transfer.[13]

### b. The Second Wire Transfer

Plaintiff scheduled the second wire transfer on the morning of January 21 and asked Norma to cancel the transfer at 3:30 p.m. on the same day. Plaintiff's IOLA, however, did not reflect the second wire transfer until the next day. (Fischer Decl. Ex. 1.) Defendant maintains that the January 22 deduction was merely a "bookkeeping entry that does not bear on or have any relation to when the Second Transfer was completed" (Haslam Decl. ¶ 19) and that the second wire transfer was actually completed on January 21 at 9:37 a.m. (*id.* at ¶ 18). As evidence of this timeline, Defendant offers the SWIFT message that it sent to BANA at 9:37 a.m. on January 21. (*Id.* at Ex. I.) The message directs BANA to transfer the $27,895 from Plaintiff's IOLA to BANA. (*Id.*) Plaintiff does not deny the authenticity of the SWIFT message and only asserts that it is entitled to discovery "to determine the exact sequence of events between the return of the counterfeit check, the acceptance of the cancellation and recall and the completion of the transfers." (Fischer Decl. ¶ 22.)

Because Plaintiff is either unaware of or chooses to ignore Article 4-A, it does not recognize that the exact sequence of events matters only to the extent that the sequence reveals when Defendant accepted the wire transfers, as defined by § 4-A-209(1). As explained above, Defendant accepted the wire transfers when it executed them. *Id*. The January 21 SWIFT message upon which Defendant relied is uncontroverted proof that Defendant had executed and thus accepted the second wire transfer prior to Plaintiff's representative's conversation with Norma. When the second wire transfer appeared on Plaintiff's account statement is irrelevant to the inquiry required under Article 4-A.

Thus, for the same reasons that Defendant is not liable for its attempted cancellation of the first transfer, Defendant is also not liable for its attempted cancellation of the second wire transfer. Therefore, Plaintiff's cause of action for negligence fails as a matter of law and summary judgment for Defendant is appropriate.

---

[13] Even if Plaintiff could plead common law negligence, its negligence claim with respect to the first transfer would likely fail because of a lack of proximate causation. Hana Bank's SWIFT message responding to Defendant's request for a recall of the first wire transfer stated that Hana Bank had "credited 182769.86/USD to ultimate beneficiary account on 1/21/[09] . . . and the beneficiary retrieved all the fund [sic] from his account on the same day." (Haslam Decl., Ex. O.) At 3:30 p.m. EST on January 21, it was 5:30 a.m. on *January 22*, in Seoul, South Korea. If Hana Bank's SWIFT message referred to January 21 in South Korea, then Defendant was incapable of canceling the first wire transfer by the time Plaintiff asked Defendant to do so.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment. The Clerk of the Court is directed to terminate the motion located at docket number 10 and close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: May 27, 2010
New York, New York

\* \* \*

Plaintiff, *pro se*, is the Barry Fischer Law Firm, formerly known as Fischer & Mandell, LLP, 550 Fifth Ave., 6 Floor, New York, NY 10036. Defendant is represented by Barry J. Glickman of Zeichner Ellman & Krause LLP, 575 Lexington Ave., New York, NY 10022.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/28/10